FILED
11/18/2022
Clerk of the
Appellate Courts

# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
February 24, 2022 Session Heard at Nashville[1]

## STATE OF TENNESSEE v. TYSHON BOOKER

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 108568   G. Scott Green, Judge**

_____

### No. E2018-01439-SC-R11-CD

_____

Tyshon Booker challenges the constitutionality of Tennessee's mandatory sentence of life imprisonment when imposed on a juvenile homicide offender. In fulfilling our duty to decide constitutional issues, we hold that an automatic life sentence when imposed on a juvenile homicide offender with no consideration of the juvenile's age or other circumstances violates the prohibition against cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Mr. Booker stands convicted of felony murder and especially aggravated robbery—crimes he committed when he was sixteen years old. For the homicide conviction, the trial court automatically sentenced Mr. Booker under Tennessee Code Annotated section 40-35-501(h)(2) to life in prison, a sixty-year sentence requiring at least fifty-one years of incarceration. But this sentence does not square with the United States Supreme Court's interpretation of the Eighth Amendment. When sentencing a juvenile homicide offender, a court must have discretion to impose a lesser sentence after considering the juvenile's age and other circumstances. Here, the court had no sentencing discretion. In remedying this constitutional violation, we exercise judicial restraint. We need not create a new sentencing scheme or resentence Mr. Booker—his life sentence stands. Rather, we follow the policy embodied in the federal Constitution as explained in _Montgomery v. Louisiana_, 577 U.S. 190 (2016) and grant Mr. Booker an individualized parole hearing where his age and other circumstances will be properly considered. The timing of his parole hearing is based on release eligibility in the unrepealed version of section 40-35-501(h)(1), previously in effect, that provides for a term of sixty years with release eligibility of sixty percent, but not less than twenty-five years of service. Thus, Mr. Booker remains sentenced to sixty years in prison, and after he has served between twenty-five and thirty-six years, he will receive an individualized parole

---

[1] We first heard oral argument on February 24, 2021. In light of the untimely death of Justice Cornelia A. Clark and by order of this Court filed December 17, 2021, retired Tennessee Supreme Court Justice William C. Koch, Jr. was designated to participate in this appeal. The case was re-argued on February 24, 2022.

hearing where his age and other circumstances will be considered. Our limited ruling, applying only to juvenile homicide offenders, promotes the State's interest in finality and efficient use of resources, protects Mr. Booker's Eighth Amendment rights, and is based on sentencing policy enacted by the General Assembly.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Reversed in Part**

SHARON G. LEE., J., delivered the opinion of the Court, in which WILLIAM C. KOCH, JR., SP.J., joined. HOLLY KIRBY, J., filed an opinion concurring in the judgment. JEFFREY S. BIVINS, J., filed a dissenting opinion, in which ROGER A. PAGE, C.J., joined.

Eric Lutton, District Public Defender, and Jonathan P. Harwell, Assistant District Public Defender, for the appellant, Tyshon Booker.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Zachary T. Hinkle, Associate Solicitor General; Mark Alexander Carver, Honors Fellow, Office of the Solicitor General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald and Phillip Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

Amy R. Mohan and L. Webb Campbell II, Nashville, Tennessee, and Marsha L. Levick, Philadelphia, Pennsylvania, for the Amicus Curiae, Juvenile Law Center.

Charles W. Bone, Nashville, Tennessee, and J. Houston Gordon, Covington, Tennessee, for the Amici Curiae, The Foundation for Justice, Freedom and Mercy, and Cyntoia Brown Long.

Edmund S. Sauer and Richard W.F. Swor, Nashville, Tennessee, for the Amicus Curiae, Raphah Institute.

Gibeault C. Creson, Alexandra Ortiz Hadley, and Robert R. McLeod, Nashville, Tennessee, for the Amicus Curiae, Julie A. Gallagher.

Gregory D. Smith, J. David Wicker, and Alexandra T. MacKay, Nashville, Tennessee, for the Amicus Curiae, Tennessee State Conference of the NAACP.

Meri B. Gordon, Rachel H. Berg, Joshua D. Arters, and Samantha M. Flener, Nashville, Tennessee, for the Amici Curiae, Campaign for the Fair Sentencing of Youth and the Children's Defense Fund.

Michael R. Working, David R. Esquivel, Jeff H. Gibson, Sarah Miller, Angela L. Bergman, Bradley A. MacLean, and Jonathan D. Cooper, Nashville, Tennessee, and Lucille A. Jewel and Stephen Ross Johnson, Knoxville, Tennessee, for the Amici Curiae, Tennessee Association of Criminal Defense Lawyers, National Association of Criminal Defense Lawyers, Charles Lowe-Kelley, and Amos Brown.

Thomas H. Castelli, Stella Yarbrough, James G. Thomas, and Nathan C. Sanders, Nashville, Tennessee, for the Amicus Curiae, American Civil Liberties Union of Tennessee.

W.J. Michael Cody and William David Irvine Jr., Memphis, Tennessee, for the Amici Curiae, American Baptist College, The American Muslim Advisory Council, The Rt. Rev. John C. Bauerschmidt, Bishop of The Episcopal Diocese of Tennessee, The Rt. Rev. Brian L. Cole, Bishop of the Episcopal Diocese of East Tennessee, The Rt. Rev. Phoebe A. Roaf, Bishop of the Episcopal Diocese of West Tennessee, The Most Reverend J. Mark Spalding, Bishop, Catholic Diocese of Nashville in Tennessee, The Most Reverend Richard F. Stika, Bishop, Catholic Diocese of Knoxville in Tennessee, The Most Reverend David P. Talley, Bishop, Catholic Diocese of Memphis in Tennessee, The Reverend Kevin L. Strickland, Bishop of the Southeastern Synod of the Evangelical Lutheran Church in America, The Black Clergy Collaborative of Memphis, Memphis Interfaith Coalition for Action and Hope, Nashville Organized for Action and Hope, Chattanoogans in Action for Love, Equality, and Benevolence, Interdenominational Ministers Fellowship, Islamic Center of Nashville, CCDA Knoxville, Woodland Presbyterian Church, Knoxville Christian Arts Ministries, Nashville Jewish Social Justice Roundtable, Rabbi Micah Greenstein, Rabbi Jeremy Simons, Rabbi Philip Rice, Ministry Table of West End United Methodist Church, Pastor Anna Lee, Knoxville Underground, Yoke Youth Ministries, Bishop Joseph Warren Walker, Bishop Edward H. Stephens, Jr., Pastor Peris J. Lester, Reverend Dr. Byron C. Moore, MPC, Reverend Dr. J. Lawrence Turner, Minister J.P. Conway, Minister Josh Graves, Professor Lee Camp, Raising a Voice, Reverends Jeannie Hunter and Robert Early, Reverend Mike Wilson, Reverend Mary Louise McCullough, Reverend C. Nolan Huizenga, Reverend Timothy E. Kimbrough, Dave McNeely, Pastor Brad Raby, Pastor Doug Banister, Pastor Russ Ramsey, Pastors Jonathan Nash, Elliott Cherry, and Matt Avery, and Mosaic Church.

## OPINION

### I.

This case requires us to rule on the constitutionality of the statutory sentencing process for juvenile homicide offenders. History teaches that our constitutional union is preserved best when the three branches of government respect our state and federal constitutions, particularly the proper roles assigned to each branch of government. As

Justice Bivins recently reminded us, the Tennessee Constitution establishes this Court as "the supreme judicial tribunal of the [S]tate." *State v. Lowe*, 552 S.W.3d 842, 856 (Tenn. 2018) (quoting *Barger v. Brock*, 535 S.W.2d 337, 340 (Tenn. 1976)). Accordingly, this Court has the sole authority—and responsibility—to "determine the constitutionality of actions taken by the other two branches of government." *Richardson v. Tenn. Bd. of Dentistry*, 913 S.W.2d 446, 453 (Tenn. 1995) (citing *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 148 (Tenn. 1993)); *see also Jordan v. Knox Cnty.*, 213 S.W.3d 751, 780 (Tenn. 2007) ("When there is a challenge, the judicial branch of government has a duty to determine the substantive constitutionality of statutes, ordinances, and like measures." (citing *City of Memphis v. Shelby Cnty. Election Comm'n*, 146 S.W.3d 531, 536 (Tenn. 2004))); *Huntsman's Lessee v. Randolph*, 6 Tenn. (5 Hayw.) 263, 271 (1818) (recognizing the courts' duty to determine the substantive constitutionality of statutes).

This Court cannot wield its constitutional prerogative in a way that usurps the authority of the other two branches of government. *See* Tenn. Const. art. II, § 2. It is not our prerogative to determine whether a statute is "dictated by a wise or foolish policy." *Cosmopolitan Life Ins. Co. v. Northington*, 300 S.W.2d 911, 918 (Tenn. 1957). We are not "free to write [our] personal opinions on public policy into law." *Jordan*, 213 S.W.3d at 780.

However, if our constitutions are to remain viable and their integrity maintained, we must strike down statutes that violate either the federal or the state constitution.[2] We have the power and duty to declare a statute void when it violates the prohibition against cruel and unusual punishment in article I, section 16 of the Tennessee Constitution. *Brinkley v. State*, 143 S.W. 1120, 1122 (Tenn. 1911). There is no precedent or reasoned principle that prevents us from determining whether a Tennessee statute violates a similar constitutional protection in the Eighth Amendment to the United States Constitution. The fact that the United States Supreme Court has not yet addressed the precise question before us provides

---

[2] *Hooker v. Haslam*, 393 S.W.3d 156, 165 (Tenn. 2012); *Planned Parenthood of Middle Tenn. v. Sundquist*, 38 S.W.3d 1, 7 (Tenn. 2000), superseded by constitutional amendment, Tenn. Const. art. I, § 36 (2014); *Biggs v. Beeler*, 173 S.W.2d 946, 948 (Tenn. 1943). The United States Supreme Court has recognized that state courts have jurisdiction to hear federal constitutional claims. Over two hundred years ago, the Court noted:

> [T]he constitution not only contemplated, but meant to provide for cases within the scope of the judicial power of the United States, which might yet depend before state tribunals. It was foreseen that in the exercise of their ordinary jurisdiction, state courts would incidentally take cognizance of cases arising under the constitution, the laws, and treaties of the United States.

*Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 342 (1816).

scant justification to shirk our duty to "say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

## II.

We begin with a review of the facts of this case. On Sunday afternoon, November 15, 2015, sixteen-year-old Tyshon Booker and another juvenile, Bradley Robinson, were riding around in Knoxville with Mr. Robinson's friend, the twenty-six-year-old victim, G'Metrik Caldwell. The victim drove his car, with Mr. Robinson riding in the front passenger seat and Mr. Booker in the rear passenger seat. Late in the afternoon after the victim pulled his car to a curb, Mr. Booker shot him six times in the back, the side of the chest, and right shoulder. Mr. Robinson and Mr. Booker, who had the victim's cell phone, ran from the scene. More than $800 and a baggy containing a green leafy substance were found in the victim's pockets after the shooting. He died from multiple gunshot wounds.

Mr. Booker was charged with murder in a petition filed in Knox County Juvenile Court. Following a hearing, the juvenile court transferred his case to the Knox County Criminal Court.[3] Mr. Booker was later indicted on two counts of first-degree felony murder and two counts of especially aggravated robbery for taking the victim's cell phone.[4]

At trial, a neighbor of Mr. Booker's testified that the morning after the murder, Mr. Booker told her that he and Mr. Robinson had planned to rob the victim but that the victim resisted and Mr. Robinson yelled at Mr. Booker to shoot. The neighbor further stated that Mr. Booker told her once he started shooting, he could not stop until he had fired all the bullets. When Mr. Booker testified at trial, he admitted shooting the victim but claimed he acted in self-defense. Mr. Booker explained that he and Mr. Robinson rode around with the victim in his car and smoked marijuana and took two pills supplied by the victim. According to Mr. Booker's testimony, when the victim pulled his car to the curb to let Mr. Booker out, the victim and Mr. Robinson began fighting. Mr. Booker said he saw the victim reaching down for something in the front floorboard, and Mr. Robinson yelled, "He got a gun, bro." Mr. Booker stated that when he saw the victim holding a gun and starting to turn

---

[3] Only an adult may be tried for first-degree murder, but the juvenile court was authorized to transfer a juvenile offender to criminal court to be tried as an adult. *See* Tenn. Code Ann. § 37-1-134 (2014 & Supp. 2021).

[4] Mr. Robinson was also charged with murder in a juvenile court petition and transferred to criminal court to be tried as an adult. *See State v. Robinson*, No. E2020-00555-CCA-R3-CD, 2021 WL 1884713, at *6 (Tenn. Crim. App. May 11, 2021), *perm. app. denied* (Tenn. Sept. 22, 2021). Mr. Robinson and Mr. Booker were indicted together on the same charges. *Id.* at *1. Mr. Robinson's case was severed, and a jury convicted him of facilitation of first-degree felony murder and facilitation of especially aggravated robbery. *Id.* at *6. Mr. Robinson's effective sentence was thirty-seven years. *Id.* at *1.

toward him in the back seat, Mr. Booker shot the victim until he stopped moving. Mr. Booker denied he planned to rob the victim, explaining that he borrowed the victim's cell phone to call his girlfriend. Mr. Booker stated that after the shooting, he ran from the scene not realizing he had the victim's phone in his pocket.

The jury convicted Mr. Booker of two counts of first-degree felony murder[5] and two counts of especially aggravated robbery. The trial court merged the two felony murder convictions and, without a hearing, sentenced Mr. Booker to life in prison. This sentence has a sixty-year term with release after fifty-one years if all applicable sentencing credits are earned and retained. *See* Tenn. Code Ann. § 40-35-501(h)(2) (Supp. 2021).[6] The trial court merged the two especially aggravated robbery convictions and, after a hearing, sentenced Mr. Booker to twenty years—less than the maximum punishment—to be served concurrently with his life sentence. The trial court denied Mr. Booker's motion for a new trial.

In the Court of Criminal Appeals, Mr. Booker challenged the constitutionality of Tennessee's automatic life sentence for first-degree murder when imposed on a juvenile.[7] The Court of Criminal Appeals affirmed, acknowledging Mr. Booker's argument but deferring to existing precedent. *State v. Booker*, E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *33 (Tenn. Crim. App. Apr. 8, 2020).

We granted Mr. Booker's application for permission to appeal to address the constitutionality of Tennessee's sentence of life imprisonment when automatically imposed on a juvenile homicide offender. Order, *State v. Booker*, No. E2018-01439-SC-

---

[5] Felony murder is a form of first-degree murder that does not require premeditation but involves a killing committed during the commission of or attempt to commit a violent felony such as arson, rape, or robbery. Tenn. Code Ann. § 39-13-202(a)(2) (2018 & Supp. 2021). Other forms of first-degree murder are killings that are premeditated and intentional, *id.* § -202(a)(1), result from a bombing, *id.* § -202(a)(3), or occur during the commission of or attempted commission of an act of terrorism, *id.* § -202(a)(4).

[6] Section 40-35-501(h)(2) is the current version of the statute, which was previously numbered as sections 40-35-501(i)(1) and (i)(2)(a), and is substantively identical. Tennessee law mandates a sentence of death, imprisonment for life without possibility of parole, or imprisonment for life for those convicted of felony murder. *See* Tenn. Code Ann. §§ 39-13-202(a)(2) & (c)(1)–(2) (2018 & Supp. 2021). Mr. Booker was not eligible for the death penalty, *see Roper v. Simmons*, 543 U.S. 551, 568 (2005), and the State did not give notice of intent to seek life without parole. *See* Tenn. Code Ann. § 39-13-208(a)–(c) (2018 & Supp. 2021). Thus, Mr. Booker's sentence of life imprisonment was mandatory. *See* Tenn. Code Ann. § 39-13-208(c).

[7] Mr. Booker also asserted other claims, including the prosecution's failure to disclose exculpatory evidence, juror misconduct, improper closing argument and jury instructions, and challenges to the juvenile transfer process.

R11-CD (Tenn. Sept. 16, 2020) (granting application for permission to appeal). Mr. Booker argues that the life sentence of at least fifty-one years and no more than sixty years violates the Eighth Amendment to the United States Constitution and article I, section 16 of the Tennessee Constitution. Mr. Booker's arguments find universal support in the many briefs filed by amici curiae.[8] The State contends that the life sentence, which guarantees release after sixty years, contravenes neither the United States Constitution nor the Tennessee Constitution.

III.

We review questions of constitutional interpretation de novo without presuming the correctness of the lower court's legal conclusions. *State v. Burns*, 205 S.W.3d 412, 414 (Tenn. 2006) (citing *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001)). Ruling on a constitutional challenge to a statute is often an exercise in judicial restraint. We must be careful not to impose our own policy views on the matter or overstep into the General Assembly's realm of making reasoned policy judgments. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 717 (Tenn. 1997). Similarly, when construing statutes, "it is our duty to adopt a construction which will sustain [the] statute and avoid constitutional conflict if any reasonable construction exists that satisfies the requirements of the Constitution." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 529 (Tenn. 1993).

*The Eighth Amendment and Juvenile Sentencing*

Over a century ago, the United States Supreme Court acknowledged that the principle of proportionality is embedded in the Eighth Amendment. The Court said that "it is a precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).

The Court's later opinions applying the proportionality principle do not chart a straight course.[9] In 1983, after noting that "[t]he principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law

---

[8] Briefs were filed as amici curiae by a coalition of religious organizations in Tennessee; the Tennessee State Conference of the NAACP; the Campaign for the Fair Sentencing of Youth and the Children's Defense Fund; the Juvenile Law Center; the Tennessee and National Associations of Criminal Defense Lawyers; Charles Lowe-Kelley; Amos Brown; the ACLU of Tennessee; the Raphah Institute; the Foundation for Justice, Freedom and Mercy; Cyntoia Brown Long; and Julie A. Gallagher.

[9] We have observed that "the precise contours of the federal proportionality guarantee are unclear." *State v. Harris*, 844 S.W.2d 601, 602 (Tenn. 1992) (citing *Harmelin v. Michigan*, 501 U.S. 957 (1991) (Kennedy, J., concurring in part)).

jurisprudence," the Court stated "as a matter of principle . . . a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm*, 463 U.S. 277, 284, 290 (1983). But eight years later, in *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court's controlling opinion[10] held that the Eighth Amendment contains a "narrow proportionality principle" that "does not require strict proportionality between crime and sentence" but "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 997, 1001 (Kennedy, J., concurring in part and concurring in the judgment) (quoting *Solem*, 463 U.S. at 288).

As to juveniles tried as adults, the Court has been clear about the central importance of proportionality when imposing significant criminal punishment. In 1988, the Court held that the Eighth Amendment prohibited executing juveniles who were under the age of sixteen at the time of the offense. *Thompson v. Oklahoma*, 487 U.S. 815, 838 (1988). Three principles formed the cornerstone of the Court's opinion.

The first principle was that the "authors of the Eighth Amendment drafted a categorical prohibition against the infliction of cruel and unusual punishments." *Id.* at 821. The second principle was proportionality. The Court said that the "punishment should be directly related to the personal culpability of the criminal defendant." *Id.* at 834 (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). The third principle was that "there are differences which must be accommodated in determining the rights and duties of children as compared with those of adults." *Id.* at 823 (emphasis omitted).

Based on these principles, the Court endorsed "the proposition that less culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult." *Id.* at 835. After noting that "[t]he basis for this conclusion is too obvious to require extended explanation," the Court stated that "[i]nexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult." *Id.*[11]

The *Thompson* Court declined to extend its decision to juvenile offenders older than sixteen years. *Id.* at 838. Yet when revisiting the question in 2005, the Court held that the

---

[10] The Court issued a divided opinion in *Harmelin* and later characterized Justice Kennedy's separate opinion as the "controlling opinion." *Graham v. Florida*, 560 U.S. 48, 59–60 (2010).

[11] The *Thompson* Court said that juveniles' reduced culpability arose from the fact that (1) juveniles are "less mature and responsible than adults"; (2) juveniles are "more vulnerable, more impulsive, and less self-disciplined than adults"; and (3) adolescents "may have less capacity to control their conduct and to think in long-range terms than adults." *Thompson*, 487 U.S. at 834.

Eighth Amendment prohibited imposing the death penalty on all juvenile offenders. *Roper v. Simmons*, 543 U.S. 551, 574, 578–79 (2005).

The *Roper* Court based its decision on the same principles that animated the *Thompson* Court's decision. First, the Court said that the Eighth Amendment's protection against cruel and unusual punishments "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned.'" *Id.* at 560 (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)). Second, the Court explained that three differences between juveniles and adults show that "juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569.

The three differences between juveniles and adults identified in *Roper* mirror the reasons identified in *Thompson*. The first difference is that juveniles lack maturity and have "an underdeveloped sense of responsibility." *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). The second difference is that juveniles are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982)). The third difference is that "the character of a juvenile is not as well formed as that of an adult." *Id.* at 570.

Like the *Thompson* Court, the *Roper* Court addressed the Eighth Amendment issue by adopting a bright-line prophylactic rule based on the age of the juvenile when the crime was committed. Justice O'Connor, writing separately, agreed that "juveniles as a class are generally less mature, less responsible, and less fully formed than adults, and . . . these differences bear on juveniles' comparative moral culpability." *Id.* at 599 (O'Connor, J., dissenting). But she disagreed with creating a bright-line rule because "the class of offenders . . . is too broad and too diverse to warrant categorical prohibition." *Id.* at 601. Justice O'Connor preferred to address proportionality concerns "through individualized sentencing in which juries are required to give appropriate mitigating weight to the defendant's immaturity, his [or her] susceptibility to outside pressures, his [or her] cognizance of the consequences of his [or her] actions, and so forth." *Id.* at 602–03. Thus, Justice O'Connor favored addressing the Eighth Amendment issue with a procedural remedy.

In 2010, the Court employed another bright-line prophylactic rule, holding that the Eighth Amendment prohibits sentencing a juvenile who has not committed homicide to a life-without-parole sentence. *Graham v. Florida*, 560 U.S. 48, 82 (2010). Reflecting the reasoning in *Thompson* and *Roper*, the *Graham* Court's decision was based on the proportionality principle and the lesser culpability of juveniles. The Court said that "[t]he concept of proportionality is central to the Eighth Amendment." *Id.* at 59. Then, relying on the three differences between juveniles and adults discussed in *Roper*, the Court stated that juveniles are "less deserving of the most severe punishments" because they are less

culpable. *Id.* at 68. Finally, the Court said that "[n]o recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles." *Id.*

Chief Justice Roberts concurred in the judgment, agreeing that Mr. Graham's life-without-parole sentence violated the Eighth Amendment. Chief Justice Roberts cited the *Roper* Court's conclusion that "juvenile offenders are generally less culpable than adults who commit the same crimes." *Id.* at 86 (Roberts, C.J., concurring in the judgment). And he invoked the narrow proportionality rule applicable to noncapital cases. Noting that "an offender's juvenile status can play a central role in the inquiry," *id.* at 90, the Chief Justice said:

> Terrance Graham committed serious offenses, for which he deserves serious punishment. But he was only 16 years old, and under our Court's precedents, his youth is one factor, among others, that should be considered in deciding whether his punishment was unconstitutionally excessive. In my view, Graham's age—together with the nature of his criminal activity and the unusual severity of his sentence—tips the constitutional balance. I thus concur in the Court's judgment that Graham's sentence of life without parole violated the Eighth Amendment.

*Id.* at 96.

In *Miller v. Alabama*, 567 U.S. 460 (2012), the Court held that mandatory life-without-parole sentences for juveniles violated the Eighth Amendment. The Court based its decision on the two essential principles found in *Thompson*, *Roper*, and *Graham* but fashioned a different remedy to address the constitutional violation.

First, after noting that "[t]he concept of proportionality is central to the Eighth Amendment," the Court said that the Eighth Amendment "guarantees individuals the right not to be subjected to excessive sanctions" and that this right "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Id.* at 469 (first quoting *Graham*, 560 U.S. at 59; and then quoting *Roper*, 543 U.S. at 560).

Second, the Court said that "children are constitutionally different from adults for purposes of sentencing." *Id.* at 471. Relying on the "three significant gaps between juveniles and adults" discussed in *Graham*, the Court said that juveniles "are less deserving of the most severe punishments" because they "have diminished culpability and greater prospects for reform." *Id.* (quoting *Graham*, 560 U.S. at 68). The Court added that "the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 472.

But the Court declined to devise another bright-line rule to remedy the Eighth Amendment problem and instead turned its attention to the sentencing process itself. Consistent with Justice O'Connor's dissenting opinion in *Roper* seven years earlier, the Court decided that the proportionality concerns should be addressed by requiring individualized sentencing so that the sentencer could give appropriate weight to the youthfulness of the defendant. *Id.* at 489. The Court held that mandatory life-without-parole sentences for juveniles "contravene[d] *Graham*'s (and also *Roper*'s) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at 474. Thus, the Court found that subjecting juveniles to a mandatory life-without-parole sentence violates the Eighth Amendment because the sentencing authority did not have the opportunity to consider the "mitigating qualities of youth." *Id.* at 476 (quoting *Johnson*, 509 U.S. at 367).

The *Miller* Court emphasized the fundamental importance of individualized sentencing to avoid imposing disproportionate punishment on juveniles facing a state's harshest penalties. Mandatory sentencing laws "remov[e] youth from the balance" and "prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. Without individualized sentencing for juveniles facing a state's harshest penalties, the sentencing authority "misses too much," and thereby runs "too great a risk of disproportionate punishment." *Id.* at 477, 479.

The Court decided two *Miller*-related cases after 2012. In 2016, the Court held that *Miller* should be applied retroactively because it announced a new substantive rule of constitutional law. *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016). The petitioner in *Montgomery* had been automatically sentenced to life without parole for an offense he committed when he was seventeen years old. *Id.* at 194. After the Court decided *Miller*, the petitioner, then sixty-nine years old, sought collateral review of his mandatory sentence. *Id.* at 195. The Court applied *Miller* retroactively and explained that a *Miller* violation did not require resentencing but could be remedied by allowing juvenile homicide offenders to be considered for parole. *Id.* at 206. In 2021, the Court held that neither the Eighth Amendment nor *Miller* requires separate findings or an on-the-record explanation of permanent incorrigibility before imposing a discretionary life-without-parole sentence on a juvenile. *Jones v. Mississippi*, 141 S. Ct. 1307, 1318–19, 1321 (2021).

In neither case did the Court retreat from the essential principles in *Thompson*, *Roper*, *Graham*, and *Miller*. In *Montgomery*, the Court repeated *Miller*'s point that "[b]y making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," a mandatory life-without-parole sentence "poses too great a risk of disproportionate punishment." *Montgomery*, 577 U.S. at 195 (quoting *Miller*, 567 U.S. at 479). In *Jones*, the Court acknowledged that "youth matters in sentencing," and the "key

assumption" in *Miller* is "that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age." *Jones*, 141 S. Ct. at 1314, 1318.

The *Miller* Court's decision that the mandatory imposition on a juvenile of a life-without-parole sentence poses too great a risk of disproportionate punishment reflects its concern, at least when a state's severest punishments are involved, that a mandatory sentencing scheme risks erroneously depriving a juvenile's right to receive a proportionate sentence. *Miller*, 567 U.S. at 479. The Court's remedy does not preclude juveniles from being sentenced to life without parole. Rather, the remedy requires a procedural safeguard—individualized sentencing—to minimize the risk of erroneously imposing a disproportionate sentence. *Id.* at 489.

Although this case involves a life sentence, and not death or life without parole, three essential rules can be derived from the *Thompson*, *Roper*, *Graham*, and *Miller* line of cases when considering proportionality. The first principle is that the Eighth Amendment's requirement of proportionality means that punishment has to be graduated and proportioned. The second principle is that steps must be taken to minimize the risk of a disproportionate sentence when juveniles are facing the possible imposition of a state's harshest punishments. The third principle is that these steps, whatever they may be, must allow the sentencer to take the mitigating qualities of youth into account by considering, among other relevant factors, (a) the juvenile's "lack of maturity" and "underdeveloped sense of responsibility," which can lead to "recklessness, impulsivity, and heedless risk-taking"; (b) the juvenile's vulnerability and susceptibility to negative influences and outside pressure, as from family and peers; and (c) the fluidity of the development of the juvenile's character and personal traits. *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 569–70).

*Tennessee's Automatic Life Sentence*

With these principles in mind, we turn to a proportionality analysis. In determining whether Tennessee's automatic life sentence when imposed on juvenile homicide offenders complies with the Eighth Amendment's requirement of proportionality, we consider whether "the punishment for the crime conforms with contemporary standards of decency," "whether the punishment is grossly disproportionate to the offense," and whether the sentence goes beyond what is necessary to accomplish "legitimate penological objectives." *Abdur'Rahman v. Bredesen*, 181 S.W.3d 292, 306 (Tenn. 2005) (citing *Roper*, 543 U.S. at 560–61; *Atkins*, 536 U.S. at 311–12; *Solem*, 463 U.S. at 292).

"Reliable objective evidence of contemporary values" can be provided by a review of "legislation enacted by the country's legislators." *Penry v. Lynaugh*, 492 U.S. 302, 331

(1989) *abrogated by Atkins,* 536 U.S. 304. This is in addition to "[a]ctual sentencing practices" because they are "an important part of the Court's inquiry into consensus." *Graham*, 560 U.S. at 62.

Compared to the other forty-nine states, Tennessee is a clear outlier in its sentencing of juvenile homicide offenders. So much so that Tennessee's life sentence when automatically imposed on a juvenile is the harshest of any sentence in the country. No one, including the dissent, disputes that a juvenile offender serving a life sentence in Tennessee is incarcerated longer than juvenile offenders serving life sentences in other states. For example, had Mr. Booker committed felony murder in nearby Alabama, he would have been eligible for release in fifteen years; twenty years in Virginia; twenty-five years in North Carolina, Kentucky, and Missouri; thirty years in Georgia; and twenty-five to thirty years in Arkansas.[12]

Juvenile homicide offenders with life sentences (and in some states, even life-without-parole sentences) may be eligible for release within twenty-five years or less in twenty-three states (Alabama, California, Florida, Hawaii, Idaho, Illinois, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Jersey, New York, North Carolina, North Dakota, Oregon, Rhode Island, Utah, Virginia, Washington, West Virginia, Wisconsin, and Wyoming) and the District of Columbia.[13] The release eligibility for a life sentence ranges

---

[12] *See* Ala. Code § 15-22-28(e)(2) (West, Westlaw through Act 2022-442 of 2022 Reg. & First Sp. Sess.); Va. Code Ann. § 53.1-165.1(E) (West, Westlaw through 2022 Reg. Sess. and 2022 Sp. Sess. I, cc. 1 to 22); N.C. Gen. Stat. Ann. § 15A-1340.19A to .19C. (West, Westlaw through S.L. 2022-75 of 2022 Reg. Sess.); Ky. Rev. Stat. Ann. § 640.040 (West, Westlaw through 2022 Reg. & Extraordinary Sess.); Mo. Ann. Stat. § 558.047.1(1)–(2) (West, Westlaw through WID 37 of 2022 Second Reg. Sess.); Ga. Code Ann. § 17-10-6.1 (West, Westlaw through 2022 Reg. Sess.); Ark. Code Ann. § 16-93-621(a)(2)(A) (West, Westlaw through 2022 Third Extraordinary Sess.).

[13] *See* Ala. Code § 15-22-28(e)(2) (15 years); Cal. Penal Code § 3051(b)(4) (West, Westlaw current with urgency legislation through Ch. 997 of 2022 Reg. Sess.) (25 years for a life-without-parole sentence); D.C. Code Ann. §§ 24-403(a) (West, Westlaw through June 30, 2022) (15 years), -403.01(c)(2)(B) (no life without parole); Fla. Stat. Ann. § 921.1402(2) (West, Westlaw through July 1, 2022) (25 years for a life sentence); Haw. Rev. Stat. Ann. §§ 706-656(1), -669(1) (West, Westlaw through 2022 Reg. Sess.) (set by parole board, with immediate eligibility and consideration of youth); Idaho Code Ann. § 18-4004 (West, Westlaw through 2022 Second Reg. Sess. & First Extraordinary Sess.) (10 years); 730 Ill. Comp. Stat. Ann. §§ 5/5-4.5-115, 5-4.5-105, 5-8-1 (West, Westlaw through P.A. 102–1102 of 2022 Reg. Sess.) (20 years, with review of *Miller*'s mitigating considerations and discretionary enhancements, not applicable to Mr. Booker's facts, requiring 40 years and up to natural life); Ky. Rev. Stat. Ann. § 640.040(1) (25 years); La. Stat. Ann. § 15:574.4(E) (West, Westlaw through 2022 First Extraordinary & Reg. Sess.) (25 years for all juvenile homicide offenders, with mandatory conditions); Md. Code Ann., Corr. Servs. § 7-301(d) (West, Westlaw through 2022 Reg. Sess.) (25 years for a life sentence); Mo. Ann. Stat. § 558.047(1)(2) (25 years for a life sentence); Nev. Rev. Stat. Ann. § 213.12135 (West, Westlaw through Ch. 2 (End) of 33rd Sp. Sess. 2021) (20 years, but not for multiple victims); *State v. Comer*, 266 A.3d 374, 380–81 (N.J. 2022) (permitting juvenile homicide offenders to petition for a 20-year look-back hearing applying *Miller* factors

from twenty-five to thirty-five years in twelve other states (Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Massachusetts, Minnesota, Montana, New Mexico, Ohio, and Pennsylvania).[14] In sum, compared to Tennessee's fifty-one-year minimum and sixty-year maximum sentence, thirty-six or nearly three-fourths of other states allow juvenile offenders release eligibility in less than thirty-five years. Two states (Oklahoma and Texas) guarantee parole eligibility in thirty-eight and forty years, respectively.[15] The other twelve states besides Tennessee (Alaska, Indiana, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, New Hampshire, South Carolina, South Dakota, and Vermont)

---

to avoid constitutional infirmity of a mandatory 30-year-minimum sentence under N.J. Stat. Ann. § 2C:11-3(b)(1)); N.Y. Penal Law §§ 70.00(3)(a)(i), -(5) (West, Westlaw through L.2022, chs. 1 to 566) (20 to 25 years; no life without parole); N.C. Gen. Stat. Ann. §15A-1340.19A (25 years for a life sentence, no life without parole for felony murder); N.D. Cent. Code Ann. § 12.1-32-13.1 (West, Westlaw through 2021 Reg. & Sp. Sess.) (20 years for all); Or. Rev. Stat. Ann. § 144.397 (West, Westlaw through 2022 Reg. Sess.) (15 years for life and life without parole); 13 R.I. Gen. Laws Ann. § 13-8-13(e) (West, Westlaw current with effective legislation through Ch. 442 of 2022 Reg. Sess.) (20 years for a life sentence); Utah Code Ann. §§ 76-3-206(2)(a)(ii), (b) (West, Westlaw through 2022 Third Sp. Sess.) (25 years; no life without parole); Va. Code Ann. § 53.1-165.1(E) (20 years for all); Wash. Rev. Code Ann. § 9.94A.730(1) (West, Westlaw through 2022 Reg. Sess.) (20 years for life); W. Va. Code Ann. §§ 61-11-23(a)–(b) (West, Westlaw through 2022 First Sp. Sess., Reg. Sess., Second Sp. Sess., Third Sp. Sess., & Fourth Sp. Sess.) (15 years; no life without parole); Wis. Stat. Ann. § 973.014(1g)(a)(1) (West, Westlaw through 2021 Act 267) (20 years for a life sentence, with discretion); Wyo. Stat. Ann. § 6-10-301(c) (West, Westlaw through 2022 Budget Sess.) (25 years for all except for cases with certain subsequent adult offenses).

[14] *See* Ariz. Rev. Stat. Ann. § 13-751(A)(2) (West, Westlaw through legislation effective Sept. 24, 2022 of the Second Reg. Sess.) (25 to 35 years for life); Ark. Code Ann. § 16-93-621(a)(2)(A) (25 to 30 years for all juvenile homicide offenders); Colo. Rev. Stat. Ann. §§ 17-34-102(8)(a)–(b) (West, Westlaw through Second Reg. Sess.) (30 years for juvenile homicide offenders participating in a specialized rehabilitation program); Conn. Gen. Stat. Ann. § 54-125a(f)(1) (West, Westlaw through 2022 Reg. Sess.) (the greater of 12 years or 60% of the sentence for a sentence of 50 years of less; 30 years for a sentence of more than 50 years); Del. Code Ann. tit. 11, § 4204A(d)(2) (West, Westlaw through Ch. 424 of 151st Gen. Assemb. 2021–2022) (30 years for all), *id*. § 4204A(b)(2); Ga. Stat. Ann. § 17-10-6.1 (30 years for a life sentence); Mass. Gen. Laws. Ann. ch. 279 § 24 (West, Westlaw through Ch. 125 of 2022 Second Ann. Sess.) (20 to 30 years for a life sentence); Minn. Stat. Ann. § 244.05(4)(b) (West, Westlaw through 2022 Reg. Sess.) (30 years for life); Mont. Code Ann. § 46-23-201(4) (West, Westlaw through 2021 Sess.) (30 years); N.M. Stat. Ann. § 31-21-10(A) (West, Westlaw through 2022 Second Reg. & Third Sp. Sess.) (30 years for life); Ohio Rev. Code Ann. § 2929.03 (West, Westlaw through File 132 of 134th Gen. Assemb., 2021-2022) (20 to 30 years for life); 18 Pa. Stat. & Cons. Stat. Ann. § 1102.1 (West, Westlaw through 2022 Reg. Sess. Act 97) (25 to 35 years).

[15] *See* Tex. Gov't Code Ann. § 508.145(b) (West, Westlaw through end of 2021 Reg. & Called Sess.) (40 years for a life sentence); *Anderson v. State*, 130 P.3d 273, 282–83 (Okla. Crim. App. 2006) (85% of 45-year presumptive life sentence).

allow a sentencer to use discretion and impose a term of less than fifty years on juvenile homicide offenders.[16]

In short, Tennessee is out of step with the rest of the country in the severity of sentences imposed on juvenile homicide offenders. Automatically imposing a fifty-one-year-minimum life sentence on a juvenile offender without regard to the juvenile's age and attendant circumstances can, for some juveniles, offend contemporary standards of decency.

Next, we consider whether a sixty-year life sentence requiring a minimum of fifty-one years of service when imposed on juvenile offenders is grossly disproportionate to the crime. The answer is—it depends. A fifty-one-year prison sentence will be proportionate for some offenders, but not for others. This is where individualized sentencing matters. Proportionality concerns can be addressed when the sentencer can consider the offender's age and circumstances, the nature of the crime, and the severity of the sentence. *See Graham*, 560 U.S. at 90 (Roberts, C.J., concurring in the judgment). But in juvenile first-degree murder cases, and only in these cases, a sentence is automatically imposed without considering age, the nature of the crime, or any other factors. The mandatory life sentence when imposed on juvenile offenders is one-size-fits-all. Yet juvenile offenders and their crimes are not all the same. Thus, Tennessee's automatic life

---

[16] *See* Alaska Stat. Ann. §§ 12.55.125(a) (West, Westlaw through Aug. 27, 2022 of 2022 Second Reg. Sess.) (30 to 99 years with aggravating factors, many involving discretion), -(j) (parole eligibility for 99 at 49.5 years), -(m) (discretion if mandatory 99-year sentence for killing during robbery "would be manifestly unjust"), 33.16.090(b) (two-thirds parole eligibility for first-degree murder but subject to other discretion-empowering provisions); Ind. Code Ann. §§ 35-50-2-3; 35-50-6-4(b) (West, Westlaw through 2022 Second Reg. Sess., Second Reg. Tech. Sess., & Second Reg. Sp. Sess.) (discretionary sentencing between 45 and 65 years or life without parole); *State v. Zarate*, 908 N.W.2d 831, 855 (Iowa 2018) (discretionary factors under Iowa Code Ann. § 902.1(2)(b)); Kan. Stat. Ann. §§ 21-6620, -6623 (West, Westlaw through laws enacted during 2022 Reg. Sess. effective on July 1, 2022) (25, 40, or 50 years, with discretion); Me. Rev. Stat. Ann. tit. 17-A, § 1603(1) (West, Westlaw through 2022 Second Reg. Sess.) (at least 25 years, with discretion); *People v. Skinner*, 917 N.W.2d 292, 317 (Mich. 2018) (25 years to life without parole, with discretion under Mich. Comp. Laws Ann. § 769.25(9)); *Chandler v. State*, 242 So. 3d 65, 69–71 (Miss. 2018) (discretion under *Miller*); *State v. Castaneda*, 842 N.W.2d 740, 757–58, 762 (Neb. 2014) (holding that resentencing was required because life sentence with "no meaningful opportunity to obtain release" was imposed before *Miller* and without consideration of factors required by *Miller*); *Petition of State*, 103 A.3d 227, 229, 236 (N.H. 2014) (ordering retroactive resentencing under *Miller* for four juvenile homicide offenders, despite mandatory life without parole required by New Hampshire law); *State v. Lopez*, 261 A.3d 314, 320 (N.H. 2021) (upholding a discretionary 45-year-minimum sentence); *Aiken v. Byars*, 765 S.E.2d 572, 578 (S.C. 2014) (holding that juveniles sentenced to life without parole before *Miller* were entitled to resentencing hearing for consideration of *Miller* factors); *State v. Quevedo*, 947 N.W.2d 402, 411 (S.D. 2020) (upholding discretionary sentence of 90 years, after consideration of *Miller* factors, with eligibility for parole after 45 years); Vt. Stat. Ann. tit. 13, § 2303 (West, Westlaw through Chs. 186 and M-19 of Adjourned Sess. of 2021–2022) (35 years or more, with discretion).

sentence when imposed on juvenile offenders lacks the necessary procedural protection to guard against disproportionate sentencing.

One consistent thread running through the Supreme Court's decisions is that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471 (describing the proposition established by *Roper* and *Graham*). These differences include a child's "lack of maturity and an underdeveloped sense of responsibility," which "often result in impetuous and ill-considered actions and decisions." *Roper*, 543 U.S. at 569 (quoting *Johnson*, 509 U.S. at 367). In addition, a juvenile's brain and character traits are not fully developed, and a juvenile is particularly "susceptible to negative influences and outside pressures." *Id.* These factors bear directly on a juvenile's culpability.

Yet Tennessee statutes that require a juvenile homicide offender to be automatically sentenced to life imprisonment allow for no consideration of the principles stated in these Supreme Court decisions. In Tennessee, there is no sentencing hearing. There is no recognition that juveniles differ from adults. And the sentencer has no discretion to consider or impose a lesser punishment. *See Jones*, 141 S. Ct. at 1321 (noting that in a case involving a juvenile who committed a homicide, a state's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient). Instead, Mr. Booker's life sentence requires service of between fifty-one and sixty years. Even if he earns every available sentencing credit, Mr. Booker will spend more time behind bars than nearly any adult with the same sentence. As the Supreme Court has observed, lengthy sentences inflict more punishment on juvenile offenders than similarly situated adult offenders because juveniles will spend a higher percentage of their natural lives in prison. *See Graham*, 560 U.S. at 70–71; *Miller*, 567 U.S at 477.

Although Mr. Booker had no sentencing hearing for the first-degree murder conviction, he did have a sentencing hearing on the especially aggravated robbery conviction. At that hearing, the trial court was allowed to consider as a mitigating factor whether Mr. Booker lacked substantial judgment in committing the offense because of his youth. Tenn. Code Ann. § 40-35-113(6). The trial court imposed on Mr. Booker not the harshest sentence, but a mid-range sentence of twenty years to be served concurrently with the life sentence for first-degree murder.

Had there been a sentencing hearing for the first-degree murder conviction, the trial court could have considered Mr. Booker's age and circumstances and the nature of his crime. According to evidence presented at his juvenile transfer hearing, proof at trial, and evidence proffered at the hearing on the motion for new trial, Mr. Booker grew up in a poor, unstable, and chaotic environment. Violence was common, and Mr. Booker witnessed shootings and often heard gunfire in his neighborhood. Before Mr. Booker was born, his father was murdered. According to Mr. Booker, he was physically and

emotionally mistreated by his mother. He saw his mother being physically abused. Once when his mother was selling drugs, Mr. Booker and his family were held at gunpoint during a home invasion. Mr. Booker's relationship with his mother was "rocky," and she often "kicked" him out of the house. During these times, he lived with friends and "door to door." In the eighth grade, Mr. Booker started smoking marijuana to cope with his problems. He smoked marijuana with his family, including his mother. When he was thirteen, Mr. Booker became close to his paternal grandfather. But his grandfather was stabbed to death at his home just over a year later. Mr. Booker, who had visited his grandfather shortly before the stabbing, blamed himself for not being there to protect his grandfather. After his grandfather was murdered, Mr. Booker began skipping school, increased his marijuana use, and misbehaved more often. Before his grandfather's murder, Mr. Booker had never been in serious trouble. According to his juvenile record, he was cited for disorderly conduct, making a false report, violating curfew, and being a runaway. None of these matters led to formal charges, and all were diverted through the juvenile court system.

According to psychological expert testimony, Mr. Booker suffered from cannabis use disorder, secondary to post-traumatic stress disorder, and was amenable to treatment. Expert testimony about adolescent brain development showed that the systems that register emotions, arousal, and reward sensitivity do not fully develop until around ages fourteen to sixteen. Yet the parts of the brain that inhibit and regulate those drives do not fully develop until age twenty to twenty-five. Mr. Booker's post-traumatic stress disorder exacerbated this disparity—making the brain's "alarm system" overly sensitive to threats, bypassing adaptive responses like judgment and executive functioning, and hijacking the brain into a state of "fight, flight, or freeze." Thus, a young person like Mr. Booker is more impulsive, a bigger risk-taker, and has poor judgment. In sum, Mr. Booker's background failed to provide him stability and security, which only increased the likelihood that he would make rash, reckless, and impulsive decisions. But these circumstances were not considered at sentencing for the murder conviction.

Finally, we consider whether Tennessee's automatic life sentence is supported by sufficient penological objectives when imposed on a juvenile. *See Miller*, 567 U.S. at 472–74. These objectives are generally considered to be retribution, deterrence, preventing crime through incarceration, and rehabilitation. *Id.* Retribution is tied to an offender's culpability and blameworthiness. Thus, the reason for retribution is reduced with a juvenile compared to an adult because of the juvenile's reduced culpability. *See Miller*, 567 U.S. at 471–72. And deterrence is not effective because "'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment." *Id.* (quoting *Graham*, 560 U.S. at 71). The benefit of preventing crime through incarceration is no justification—since it necessarily implies that the "juvenile offender forever will be a danger to society" because he is incorrigible, and "incorrigibility is inconsistent with youth." *Id.* at 472–73 (quoting *Graham*, 560 U.S. at 72–73). The justification of rehabilitation also fails because

Tennessee's automatic life sentence rejects the notion that a juvenile should have the chance to change and mature. *Id.* at 473. Although a state need not guarantee a juvenile offender eventual freedom, it must not foreclose all genuine hope of a responsible and productive life or reconciliation with the community. *See Graham*, 560 U.S. at 75. This denial renders "an irrevocable judgment about that person's value and place in society." *Id.* at 74. Thus, the life sentence imposed on Mr. Booker is not supported by sufficient penological objectives.

From *Thompson*, *Roper*, *Graham*, *Miller*, *Montgomery*, and *Jones*, we know that juveniles are constitutionally different than adults for sentencing purposes; juveniles have lesser culpability and greater amenability to rehabilitation. To be clear, we are not holding that a juvenile may never receive a life sentence in Tennessee. But consistent with Supreme Court precedent, the sentencer must have discretion to impose a lesser punishment and to properly consider an offender's youth and other attendant circumstances. Tennessee's sentencing scheme for juvenile homicide offenders—which automatically imposes the most extreme punishment short of life without parole in the United States—fails to recognize that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. The current automatic sixty-year sentence does not square with the United States Supreme Court's interpretation of the Eighth Amendment.

In sum, Tennessee's automatic life sentence when imposed on juvenile homicide offenders is an outlier when compared with the other forty-nine states, it lacks individualized sentencing which serves as a bulwark against disproportionate punishment, and it goes beyond what is necessary to accomplish legitimate penological objectives. For these reasons, we hold that Tennessee's automatic life sentence with a minimum of fifty-one years when imposed on juveniles violates the Eighth Amendment.

Because we conclude that Tennessee's mandatory fifty-one- to sixty-year sentence violates the Eighth Amendment, we need not consider Mr. Booker's arguments that his sentence is equivalent to life without parole and is thus subject to *Miller*,[17] or that his life sentence violates article I, section 16 of the Tennessee Constitution. Our direct application of Eighth Amendment principles pretermits these issues.

*Remedy for Constitutional Violation*

We exercise judicial restraint when remedying the unconstitutionality of the current statutory scheme for sentencing juvenile homicide offenders. Rather than creating a new sentencing scheme or resentencing Mr. Booker, we apply the sentencing policy adopted by the General Assembly in its previous enactment of section 40-35-501. In doing so, we make

---

[17] *See, e.g.*, *State v. Kelliher*, 873 S.E.2d 366 (N.C. 2022).

no policy decisions. Nor do we substitute our judgment for that of the General Assembly. The parties agree that if the mandatory sentence of fifty-one to sixty years in section 40-35-501(h)(2) is unconstitutional, then we should apply the release eligibility provision that the General Assembly previously enacted and never repealed, that was in effect from November 1, 1989, to July 1, 1995, as stated in section 40-35-501(h)(1),[18] which still applies to conduct during that period. Under this unrepealed statute, Mr. Booker remains sentenced to a sixty-year prison term and is eligible for, although not guaranteed, supervised release on parole after serving between twenty-five and thirty-six years. Thus, at the appropriate time, Mr. Booker will receive an individualized parole hearing in which his age, rehabilitation, and other circumstances will be considered. This ruling applies only to juvenile homicide offenders—not to adult offenders.

The dissent claims, without any basis, that by upholding the protections of our United States Constitution, we are making policy. But when the Court does its duty and rules on the constitutionality of a statute, it makes no policy of its own. The Court simply implements the policy embodied in the Constitution itself. Without question, the General Assembly determines policy and enacts laws. This Court's duty is to apply the law and, when necessary, decide whether a law is constitutional. By interpreting state and federal constitutions with reasoned opinions, courts are carrying out the quintessential judicial function to "say what the law is." *Marbury*, 5 U.S. (1 Cranch) at 177. Because a party may disagree with a court's conclusion about the constitutionality of a statute does not mean that the judiciary has "usurped the legislative prerogative." *State v. Soto-Fong*, 474 P.3d 34, 43 (Ariz. 2020).

The dissent would have us wait until the United States Supreme Court rules on this precise issue. But we will not shirk our duty and ignore an injustice. Our decision today directly affects Mr. Booker and over 100 other juvenile homicide offenders who are or will be incarcerated in Tennessee prisons under an unconstitutional sentencing scheme.[19] For these incarcerated individuals, time matters. The United States Supreme Court may not

---

[18] Tennessee Code Annotated section 40-35-501(h)(1) provides:

> Release eligibility for a defendant committing the offense of first degree murder on or after November 1, 1989, but prior to July 1, 1995, who receives a sentence of imprisonment for life occurs after service of sixty percent (60%) of sixty (60) years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment for life be eligible for parole until the defendant has served a minimum of twenty-five (25) full calendar years of the sentence . . . .

[19] *See* Anita Wadhwani & Adam Tamburin, *Special Report: In Tennessee, 185 People Are Serving Life for Crimes Committed as Teens*, The Tennessean (Mar. 6, 2019), https://www.tennessean.com/story/news/2019/03/07/juvenile-sentencing-tennessee-cyntoia-brown-clemency-life/2848278002/. Of the 185 juvenile homicide offenders, 120 were sentenced under the current statute that requires incarceration between fifty-one and sixty years. *Id.*

have the chance to rule on this precise issue soon, if ever. And we need not wait because the Supreme Court has given us clear guidance in *Roper*, *Graham*, *Miller*, *Montgomery*, and *Jones*. Many other state supreme courts have resolved this issue without delay. We must fulfill our duty.

Although the constitutionality of Tennessee's practice of automatically sentencing juvenile homicide offenders to life in prison is an issue of first impression for this Court, the dissent claims the issue is settled law in Tennessee based on several unreported decisions from the Court of Criminal Appeals. Yet, as the dissent should know, this Court is not bound by decisions of the Court of Criminal Appeals. *See*, *e.g.*, *State v. Middlebrooks*, 995 S.W.2d 550, 557 n.7 (Tenn. 1999) (citing *State v. McKay*, 680 S.W.2d 447, 450 (Tenn. 1984)). And none of the intermediate appellate court decisions relied on by the dissent analyzed the constitutional issue, correctly noting that the intermediate appellate court is bound to follow existing precedent. *See State v. Douglas*, W2020-01012-CCA-R3-CD, 2021 WL 4480904, at *25 (Tenn. Crim. App. Sept. 30, 2021) (stating that although the court had "considered the Defendant's policy arguments regarding the particular length of Tennessee's life sentences, as well as the special considerations applicable to juvenile offenders and their potential for rehabilitation," the court was bound "to apply the law as it has been enacted by [the Tennessee] legislature and interpreted by [the Tennessee] courts"); *State v. Fitzpatrick*, M2018-02178-CCA-R3-CD, 2021 WL 3876968, at *8 (Tenn. Crim. App. Aug. 31, 2021) ("The power to break with well-established precedent does not lie with this court, and we are not prepared to expand the parameters of the Eighth Amendment in this regard, notwithstanding the fact that the Defendant's sentence 'may push, and possibly exceed, the bounds of his life expectancy[.]'" (quoting *State v. King*, W2019-01796-CCA-R3-CD, 2020 WL 5352154, at *2 (Tenn. Crim. App. Sept. 4, 2020))); *State v. Polochak*, M2013-02712-CCA-R3-CD, 2015 WL 226566, at *34 (Tenn. Crim. App. Jan. 16, 2015) ("While the next logical step may be to extend protection to [juvenile] sentences [of life with the possibility of parole], that is not the precedent which now exists." (quoting *Perry v. State*, W2013-00901-CCA-R3-PC, 2014 WL 1377579, at *5 (Tenn. Crim. App. Apr. 7, 2014))).

The remedy here—granting a parole hearing rather than resentencing—serves the State's interest in finality and the efficient use of its resources and also protects juvenile homicide offenders' rights under the Eighth Amendment. Applying the previous unrepealed version of section 40-35-501(h)(1) complies with *Montgomery*, which allows states to remedy a *Miller* violation by allowing juvenile homicide offenders to receive an individualized parole hearing rather than be resentenced. *Montgomery*, 577 U.S. at 212 ("Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment.").

This decision need not be the end of the discussion about sentencing juvenile homicide offenders. The General Assembly, in its collective wisdom, may decide to

continue to adhere to its previously adopted sentencing scheme as reflected in the unrepealed version of section 40-35-501(h)(1). The General Assembly may also consider enacting legislation for sentencing juvenile homicide offenders that provides for discretionary, individualized sentencing while maintaining the current life sentence, no life sentence, or a less severe sentence that is in line with the other forty-nine states. We trust the General Assembly to make these important policy decisions.

IV.

Mr. Booker committed a serious offense for which he deserves serious punishment. But he was only sixteen years old when he committed the offense. The United States Supreme Court has made clear that under the Eighth Amendment, youth is a factor that must be considered in sentencing. Thus, we hold that Tennessee's mandatory sentence of life in prison when imposed on a juvenile homicide offender with no consideration of the juvenile's age and attendant circumstances violates the Eighth Amendment's prohibition against cruel and unusual punishment. Consistent with the parties' arguments, we remedy this constitutional defect by applying the unrepealed pre-1995 version of section 40-35-501(h)(1). Under this statute, Mr. Booker remains sentenced to a sixty-year term but is eligible for, although not guaranteed, supervised release on parole after serving between twenty-five and thirty-six years. In line with *Montgomery*, Mr. Booker will, at the appropriate time, receive an individualized parole hearing in which his youth and other circumstances will be considered. This ruling applies only to juveniles, not adults, convicted of first-degree murder.

We reverse the judgment of the Court of Criminal Appeals to the extent it upheld the automatic life sentence imposed on Mr. Booker under Tennessee Code Annotated section 40-35-501(h)(2). The Clerk of the Appellate Court shall provide a copy of this opinion to the Tennessee Department of Correction and the Tennessee Board of Parole. Costs of this appeal are taxed to the State of Tennessee.

_____
SHARON G. LEE, JUSTICE